# CIRCUIT COURT OF AUGUSTA COUNTY

Commonwealth of Virginia

v.

Anthony W. Reed

February 26, 2014

Case No. CL13001583-00

By Judge Victor V. Ludwig

The defendant, Anthony W. Reed, moves this Court to exclude Dr. Nelson's expert report (the Evaluation), which the Commonwealth attached to its initial filing asking that the Court civilly commit Reed as a sexually violent predator (SVP). The issue which Reed raised in this motion and orally argued at a hearing on September 26, 2013 (the Hearing), and as to which both parties had previously submitted briefs, is whether Dr. Nelson's Evaluation is based on an adequate factual foundation as required by *Commonwealth v. Garrett*, 276 Va. 590, 606 (2008), and its progeny. Despite the parties' characterization of the issue, I infer that it is not the admissibility of the Evaluation document itself which is in question (clearly, that would not be admissible without significant redaction) but Dr. Nelson's opinion, as it is expressed in the Evaluation, amplified by his testimony at the Hearing.

Given the fact the Evaluation is the basis for the opinion, in order adequately to address the matter, it was necessary for the Court both to review the Evaluation and to hear evidence from Dr. Nelson to ascertain how the governing case law applies to the question.

## I. *Summary of the Evaluation and the Testimony at the Hearing*

In the Evaluation, Dr. Nelson concluded that Reed:

> had both the mental abnormalities of Pedophilia and Exhibitionism and a personality disorder, Schizotypal Personality Disorder, in specific. Because of these conditions, he finds it difficult to control his predatory behavior such that he is likely to engage in sexually violent acts.

Evaluation, p. 18.

At the Hearing, in response to the question whether the schizotypal personality disorder "predisposes people to commit sexually violent offenses in any way," Dr. Nelson's response was: "No, and it is not relevant to the issues about the prior charges, necessarily, that we are discussing, either." Tr. at 50. I understand the second comment in that the personality disorder may not be driven by the prior offenses; the first, that the disorder does not predispose people to commit offenses, like much of Dr. Nelson's testimony, mystifies me because the condition deemed by him to be irrelevant appears to be a necessary finding to satisfy the definition of an SVP.

Dr. Nelson described pedophilia as "an enduring sexual interest in prepubescent children [by] people who are sexually attracted, either in fantasies or behavior, in a way that is disruptive to their life for a period of, typically, six or more months, to children who are prepubescent." Tr. at 49. He described exhibitionism as "a pattern of individuals who take sexual excitement from exposing their genitalia to other non-consenting partners in that interaction and where they have done so multiple times . . . over a period of more than six months. . . ." *Id.*

In the Evaluation, in addition to the crimes which led to Reed's incarceration and ultimately to this proceeding, Dr. Nelson referred to four other documented reports of incidents and one undocumented observation.

The incidents which resulted in Reed's incarceration involved a nephew, who was also involved in the events described in item 3, and a seven-year-old girl. Reed confessed to the police that he had committed these crimes, although he subsequently recanted his confessions, claiming that he "was scared and . . . had given a false confession to the police. He denied the offense and claimed the children lied." *Id.* at 2. Reed entered Alford pleas in the cases, and, by order of March 25, 2011, the Court convicted him of two charges of aggravated sexual battery in violation of Va. Code Ann. § 18.2-67.1(3) and one charge of indecent liberties in violation of Va. Code Ann. § 18.2-370, on facts stipulated to be the Commonwealth's evidence and sufficient to convict, and adopted a written plea agreement.

1. *August 5, 2003*: There was an allegation that, when Reed was sixteen years old, he exposed his penis to a child in a bathroom stall. Reed denied the allegation, and he was found not guilty. Reed initially told Nelson that he did not recall the incident, but, when Dr. Nelson confronted him with the police report, Reed did recall it but denied that he had intentionally exposed himself. Evaluation at 1.

At the Hearing, Dr. Nelson opined that the incident supported both the diagnosis of pedophilia and of exhibitionism "because of the allegation that the specific act was exposing his penis to a child." Tr. at 55. He further opined that it was not clinically significant that Reed had been found not guilty because "from a clinical perspective, what we are interested in is whether people admit to behavior, whether they have been prosecuted for it [or] whether they have been found guilty or not. . . ." *Id.* at 70.

Whatever statements Reed made from which Dr. Nelson inferred that he had admitted unlawful conduct, Reed allegedly made them to the police at the time of the incident. There was no evidence describing the statements, and the only specific reference to any statement that Reed made was that he had not intentionally exposed himself.

Given the evidentiary limitations of introducing the details of the inadmissible information on which an expert is entitled to rely pursuant to Va. Code Ann. § 8.01-401.1, it is not surprising that there was no evidence of the specific statement that the reports allege that Reed made. Still, Dr. Nelson's subsequent remarks, described below in the body of the text of this opinion, create some doubt as to the extent to which Reed's statement to the police was different from his statement at the time of the Evaluation.

The only other enlightening comment regarding what he might have said to the police was described in Dr. Nelson's observation in the Evaluation that Reed "denied it, and was found not guilty at trial. He still denied 'it at this SVP interview." Evaluation at 1. The use of the adverb "still" implies that Reed denied it to the police as well (that he had denied it before and was still denying it when he spoke to Dr. Nelson). Assuming Dr. Nelson was describing events in chronological sequence, that implication is consistent with a plain reading of Dr. Nelson's assertion that Reed "denied it, and was found not guilty at trial." The expert's characterization of Reed's statements as an admission (presumably of some wrongdoing) was further clouded by Dr. Nelson's subsequent acknowledgement that Reed was "still denying the actual incident," leading Dr. Nelson to the conclusion that Reed's description of the event was implausible and "consistent with the types of stories that pedophiles tell as cognitive distortions to cover their behavior." Tr. at 71. Presumably, Reed's denial of the event (or at least his explanation of it) confirmed it in Dr. Nelson's mind.

There is a bit of circular logic in Dr. Nelson's observation on this issue. The event described in the police report, if true, would lead to the conclusion that Reed is a pedophile. Offering implausible explanations of events is a

characteristic of a pedophile. Reed offered an implausible explanation of the event to Dr. Nelson. Hence, Reed is a pedophile, and the substance of the event must be true.

2. *August 24, 2008*: There was an allegation that Reed "talked [a mentally ·retarded man] into showing his penis to . . . Reed, while that man's ten-year-old little brother was present." Evaluation at 2. The case of indecent exposure was "dropped." *Id.* at 1. At one point in the Hearing, the term "nolle prosequi[ed]" was used, but the Court is uncertain precisely what the disposition of the charge was. "Mr. Reed reportedly admitted the offense to the police. . . ." *Id.* at 2. As was true of the previous allegation, there was no evidence of what Reed admitted to the police. In his interview with Dr. Nelson, Reed initially claimed both that the incident did not happen and that he did not remember anything about it. However, when confronted with the police report, Reed did admit that, in the presence of the ten year old child, he asked the man to show him his penis, but he denied any sexual interest in the man and stated that the man had refused to expose himself. *Id.* at 9.

At the Hearing, Dr. Nelson opined that this incident "was less important than the other cases," but the expert did find it relevant that the situation involved a minor child as a participant "at some level." Tr. at 56 and 72. "[B]ecause an underage prepubescent boy is involved at a time when [Reed] is seeking out sexual behavior, that does point towards pedophilic interests." *Id.* The opinion was further supported by the fact that Reed "had asked both the child and young adult to come with him to the other side of the pond, so he asked to have the youngster included." *Id.* at 72.

3. *September 26, 2010*: On page 9 of the Evaluation, Dr. Nelson appears to state that the incident occurred on September 24 or September 25, 2010. This incident involved a charge of indecent exposure, although, in the Evaluation, Dr. Nelson stated that he had no records concerning it other than its having been "noted as a charge in the Augusta J&DR Court." *Id.* at 2. He said that, during his interview with Reed, Reed "recalled that his little nephew . . . barged into the bathroom and saw his penis, but Mr. Reed denied having exposed himself on purpose." Dr. Nelson did not know the disposition of that case. Evaluation at 2.

Despite having reiterated in his Evaluation that "[o]ther than a notation of the charges in the Augusta J&DR Court, no records were available about this incident," *id.* at 10, Dr. Nelson said at the Hearing that, at the time he prepared his Evaluation, he "had various records that referenced the date of this incident but no actual petitions or police report about the allegations." Tr. at 57. However, Dr. Nelson testified that, between the time of his preparing the Evaluation and the date of the Hearing, he had received mental health records in which Reed was "cited as saying in therapy that he admits to the conduct of Exhibitionism in three prior allegations, which

would presumably be the allegations or discussion here." *Id*. Later still, Dr. Nelson said that he had also received the police reports concerning this incident. *Id*. at 64 and 66.

4. *October 2012*: Two months after his release from incarceration, Reed "allegedly exposed his penis to an adult woman at a hotel, conduct which he admitted to his P.O. but denied during [the] SVP interview." Evaluation at 2. Curiously, in his more expansive description of the incident in the same document, Dr. Nelson does not state that Reed admitted anything to his Probation Officer, but he does say that Reed told Dr. Nelson that he exposed himself to the woman because she " 'asked' to see his penis." *Id*. at 12.

Although Dr. Nelson confirmed that this incident had no bearing on the issue of pedophilia, *id*. at 73, both at the Hearing and in the Evaluation, Dr. Nelson opined that Reed's statements contained in the Probation Officer's violation report support his diagnosis of Exhibitionism "because of his exposing himself, in this case to an adult female." Tr. at 62 and Evaluation at 12.

5. *Undocumented and Undated Event*: Reed's sister told Dr. Nelson that Reed had been attacked by some boys, and, after researching the incident, she "learned that he had exposed his penis to a little boy and the boy's big brother retaliated by attacking" Reed. *Id*. at 13.

Regarding the bases for his diagnoses (and recognizing that they "are likely to be in debate"), Dr. Nelson "capitulate[d] that [they could] only be reached by relying upon allegations which have not been shown to be true beyond a reasonable doubt." *Id*. at 15. Dr. Nelson used the verb "capitulate" four times in the same context, presumably intending the same meaning, and it appears to be a curious choice of word. Perhaps it is a term of art in the field of psychology with which the Court is unfamiliar; whatever, I infer that it means that Dr. Nelson, in using the verb, is simply admitting that his conclusions are grounded on allegations, some of which Reed denies and all of which are unproven to required legal standards.

Specifically with respect to the diagnosis of Exhibitionism, Dr. Nelson "capitulated" that, "to make this diagnosis one must count allegations which Mr. Reed was not convicted of and which he now refutes." *Id*. at 15-16. It is not necessary that the respondent be convicted of the alleged offense "because the standard of proof in [SVA] proceedings is different from that in a criminal trial." *Ellison v. Commonwealth*, 273 Va. 254, 257-58 (2007). However, in *Ellison*, the allegations were "made the subject of sworn testimony before a trier of fact [at the SVA proceeding]. And, unlike *Ellison*, here no inference can be drawn from the dismissal of charges that there was simply a failure of the evidence to establish Garrett's guilt under the more stringent standard applicable in criminal cases because no effort was ever made to produce evidence in support of those allegations." *Garrett* at 607.

With respect to the diagnosis of pedophilia, Dr. Nelson observed that it must be grounded on the "subject['s having] demonstrated a sexual interest in prepubescent children more than once, and across a period of six months or longer" but that the "only conduct with a child which could be confirmed via a conviction was" the conduct in 2010 of which Reed had been convicted. *Id.* at 16. In his summary, Dr. Nelson stated:

> From a clinical perspective, Mr. Reed met criteria for the mental disorder of pedophilia, in this expert's opinion. . . . The undersigned capitulates, however, that there are not irrefutable incidents of confirmed sexual misbehavior with children; Mr. Reed was repeatedly accused, made some statements of admission at the time perhaps, but nowadays he denied those other offenses. The strength of this clinical diagnosis is on the pattern of conduct and the similarities of the fact pattern, lending the accusations credibility from a psychological perspective.

*Id.* Furthermore, having stated as a fact (or a finding) that "for Mr. Reed the act of exhibiting himself or getting someone else to exhibit to him is intended as a kind of foreplay to the possibility of genital contact." *Id.* at 17. Dr. Nelson said:

> Again, however, this expert capitulates that Mr. Reed did not have multiple confirmed convictions for exposing himself. The diagnosis did involve relying upon the credibility of a pattern of similar conduct even though he had not been convicted of those similar incidents.

*Id.*

At the Hearing, regarding the diagnosis of pedophilia, in response to the inquiry as to what information supported his conclusion, Dr. Nelson said that he did "rely on [Reed's] statements to the police." Tr. at 77. In addition, it was the "specific information that I had about the prior charges;" indeed, in response to the question whether his "opinion was based exclusively on his history of sexual behavior, not testing," Dr. Nelson responded: "Correct." *Id.* at 52.

Dr. Nelson agreed that the convictions in 2010 would not alone support a diagnosis of pedophilia and that, in order to form that opinion, he had to rely on the August 2003 charge (of which Reed was found not guilty), the charge in August 2008, which was "dropped," and the incident of September 2010 (although there was no evidence that the conduct resulted in Reed's being charged with any misconduct). *Id.* at 64-65.

Dr. Nelson said that he had relied "less" on the event in 2008, involving the man and the boy at the pond, in formulating his diagnosis of pedophilia

than in formulating his diagnosis of exhibitionism. *Id.* at 64. That is a remarkable observation for two reasons. First, Dr. Nelson had earlier stated that, "because an underage prepubescent boy is involved at a time when [Reed] is seeking out sexual behavior, that does point towards pedophilic interests," *id.* at 56, although at no time, either in the Evaluation or in testimony, had he referred to the event as supporting his diagnosis of exhibitionism. Second, in opining that this incident (in which Reed asked an adult to expose his penis to Reed in the presence of a child), Dr. Nelson has apparently expanded his definition of exhibitionism to include exposure by proxy in that it was not Reed who exposed himself; rather, he asked another man to expose himself.

On redirect examination, without specifying in what particulars he did so, Dr. Nelson testified that he also relied on the evaluation records and report of Vicky Cash-Graff, Reed's therapist, which supported his diagnoses of pedophilia and exhibitionism. *Id.* at 76.

## II. *Analysis*

### A. *Statutory Standard for Admissibility*

The Court notes from the outset that the issue before it is a purely evidentiary question, and it is of no import that this matter is being addressed at the probable cause stage as opposed to the trial stage. Va. Code Ann. § 8.01-401.1 provides in relevant part:

> In any civil action any expert witness may give testimony and render an opinion or draw inferences from facts, circumstances, or data made known to or perceived by such witness at or before the hearing or trial during which he is called upon to testify. *The facts, circumstances, or data relied upon* by such witness in forming an opinion or drawing inferences, if of a type normally relied upon by others in the particular field of expertise in forming opinions and drawing inferences, *need not be admissible in evidence.*

(Emphasis added.) Paying particular attention to the highlighted portion of the statute, the Court notes that an expert may rely on hearsay evidence in arriving at a conclusion as long as that hearsay is the type normally relied upon by others in the particular field of expertise. *Garrett* at 606. Nevertheless, as broad as that statement appears to be, the Virginia Supreme Court, in *Garret* and in subsequent cases, has imposed some restrictions on what types of hearsay those in a particular field of expertise may rely.

I also note that the Court, expounding on Va. Code Ann. § 8.01-401.1, held "an expert opinion must be based on an adequate factual foundation." *Id.* (citing *Countryside Corp. v. Taylor*, 263 Va. 549, 553 (2002)).

B. *Garrett and Its Progeny (Addressing Them in the Order in Which They Were Decided)*

Although the ultimate decision regarding Reed's status is not yet before the Court, in order to prevail, the Commonwealth must prove, "by clear and convincing evidence [that] the respondent is a sexually violent predator." Va. Code Ann. § 37.2-908(C). The definition of a sexually violent predator has two prongs:

> "Sexually violent predator" means any person who (i) has been convicted of a sexually violent offense, or has been charged with a sexually violent offense and is unrestorably incompetent to stand trial pursuant to § 19.2-169.3; and (ii) because of a mental abnormality or personality disorder, finds it difficult to control his predatory behavior, which makes him likely to engage in sexually violent acts.

Va. Code Ann. § 37.2-900. In cases in which there has been a conviction, the first prong is simply a matter of fact. If the person has been convicted of a sexually violent offense, that requirement is satisfied.

The second prong has three components.

The first component describes two alternatives, specifically that the respondent must suffer from a mental abnormality or personality disorder. This first component is written in the disjunctive. It is not necessary that the respondent suffer from both a mental abnormality and a personality disorder; it is sufficient to the purpose that he be afflicted with either.

The second component requires a finding that, because of that condition, the respondent must find "it difficult to control his predatory behavior." The "predatory behavior" that is difficult to control need not be a result of the mental abnormality or personality disorder; rather, the statute appears to permit the assumption that one who has been convicted of a sexually violent offense has exhibited predatory behavior which the respondent needs to control.

The third component requires a finding that the lack of control caused by the mental abnormality or personality disorder "makes him likely to engage in sexually violent acts."

In *Garrett*, the question relevant to this proceeding, as it was initially described by the Court, was whether the trial court erred in ruling "that the Commonwealth's mental health expert would not be permitted to express an opinion based, *in part*, upon her consideration of criminal conduct of which Garrett had been accused when he was a minor, but which was not prosecuted on the Commonwealth's motion for *nolle prosequi*." *Id.* at 593 (emphasis added). Specifically, Garrett had been accused of three charges of carnal knowledge as a minor. I have emphasized "in part," not because it was so in the original but because it is not at all clear that the Court

accurately characterized the question presented, particularly in light of the question it apparently answered. Indeed, as the holding indicates, it appears that the Court actually addressed the question whether the trial court erred in ruling that the Commonwealth's mental health expert would not be permitted to express an opinion based *entirely* upon her consideration of criminal conduct of which Garrett had been accused when he was a minor, but which was not prosecuted. I suggest that the inconsistency between the issue apparently to be resolved and the one actually resolved gave rise to a question which lingered in the minds of careful readers until 2010 when, happily for circuit court judges, Justice Mims answered it. Moreover, not stated in the question presented (as framed by Justice Koontz in *Garrett*, but implicit there and made clear in later cases) is that the expert's reliance is not just on the existence of the allegation of criminal conduct but that the expert's assumption was that the allegation was true, *i.e.*, that the respondent actually committed the criminal act or acts alleged. Also left cloudy was whether the holding applied only to a diagnosis of a mental abnormality or to a diagnosis of a personality disorder as well.

In that case, the Commonwealth's expert, Dr. Gravers, "diagnosed Garrett's mental condition as including 'Paraphilia, Not Otherwise Specified . . . Sexual Abuse of Child'." *Id.* at 594. Clearly, that diagnosis was directed to the first component of the second prong of the required finding, *i.e.*, whether or not Garrett suffered from a mental abnormality or personality disorder. In fact, the evidence was directed solely to whether or not Garrett had a mental abnormality. *See Boyce v. Commonwealth*, 279 Va. 664 (2010). "Based upon this information, Dr. Miller opined that Boyce suffered from both a mental abnormality, pedophilia, and personality disorder, not otherwise specified, with antisocial traits." *Id.* at 647. Obviously, the terms are not synonymous. As an adult, Garrett had no charges of sexual abuse of a child, but, as a juvenile, he did have three unadjudicated petitions alleging carnal knowledge of a minor (all dismissed on motions to *nolle prosequi*), the allegations of which Garrett denied during his interview with Dr. Gravers.

In her testimony at the probable cause hearing, Dr. Gravers opined that Garrett:

> met the statutory criteria for a sexually violent predator . . . based not only on Garrett's performance on the standardized tests and his single conviction for rape, but also on the allegations of the carnal knowledge offenses and the other nonsexual offenses contained in the J&DR court files pertaining to Garrett. According to Dr. Gravers, she considered the petitions charging Garrett with unlawful carnal knowledge to be significant even though the petitions had been dismissed because . . . clinicians know that many charges tend to get pleaded down or through the criminal justice system might

get nol prossed, parts of plea bargaining. . . . [T]he charges frequently are actually representative of the actual behavior, while the conviction may not necessarily represent the actual behavior that took place.[1]

Dr. Gravers further testified that she also considered the nonsexual offenses in Garrett's juvenile and adult records, including offenses that had been dismissed by *nolle prosequi*, in reaching her diagnosis that Garrett had an "Antisocial Personality Disorder," which in her opinion increased the likelihood that he would commit further acts of a sexually violent nature.

*Id.* at 595. In this part of her opinion, Dr. Gravers was not addressing whether or not Garrett had a mental abnormality, specifically, paraphilia; indeed, it assumes (and Dr. Gravers had already concluded) that he did suffer from that condition. This part of Dr. Gravers' opinion, based at least in part on nonsexual offenses in Garrett's juvenile and adult records, addressed her diagnosis that Garrett suffered from a personality disorder and her conclusion that that condition tended to show antisocial behavior and Garrett's proclivity to commit further outrages. On the basis of Dr. Gravers' opinion, the trial court found probable cause to permit the matter to go to a trial on the merits.

Immediately before the trial on the merits, however, that trial court granted Garrett's motion *in limine* to exclude, during the trial, references to the unadjudicated carnal knowledge charges, not because it was inappropriate for the expert to have relied on them but because the probative value of the allegations was outweighed by the undue prejudice they might have on the jury's decision. Moreover (and more to the point), the trial court "concluded that, despite no evidence of a finding of guilt, Dr. Gravers assumed in her report that Garrett had committed the carnal knowledge offenses" and initially "ruled that Dr. Gravers' opinion, as expressed in her report that addressed the excluded evidence, also would be excluded in its entirety." *Id.* at 597. When it made its final ruling on the subject, despite the Commonwealth's argument that Dr. Gravers' opinion was based "primarily on admissible evidence including the standardized tests, her interview with Garrett, and his adult criminal history," *id.* at 598, the trial court expanded its initial ruling and excluded Dr. Gravers' opinion entirely because of her assumption that the allegations of the unadjudicated charges of carnal knowledge were true.

---

[1] The unstated implication of this comment is that Dr. Gravers believed that the charges were true, a practice disapproved not only in *Garrett* but more recently in *Lawrence v. Commonwealth*, 279 Va. 490 (2010). Indeed, the trial court in *Garrett* specifically found as a fact that Dr. Gravers believed the charges to be true. *Garrett* at 597. [Judge Ludwig's comment]

On appeal, the Commonwealth argued that the trial court erred in excluding Dr. Gravers' opinion in its entirety despite the fact that "her reliance on the three carnal knowledge petitions was only incidental to her overall opinion and diagnosis." *Id.* at 605. The Virginia Supreme Court noted, however, that, at the probable cause hearing, Dr. Gravers testified that "the three dismissed carnal knowledge petitions . . . was a significant factor in her opinion that Garrett meets the statutory criteria for civil commitment under the SVPA." *Id.* at 607. Despite that comment by the expert (implying that the dismissed carnal knowledge petitions did not stand alone in her diagnosis), the Court determined that the "only factual basis from which Dr. Gravers could have reached the diagnosis of 'Paraphilia, Not Otherwise Specified . . . Sexual Abuse of Child' was from her reliance on these petitions," *id.*, and (not surprisingly) that there was no merit to the Commonwealth's assertion that her reliance on them was merely incidental.

What is remarkable is that Dr. Gravers' diagnosis of paraphilia made any difference. Garret argued that the trial court correctly excluded the expert's opinion "because Dr. Gravers' diagnosis of "Paraphilia, Not Otherwise Specified . . . Sexual Abuse of Child" was the result of speculation and conjecture." *Id.* at 605. The Court's opinion does not indicate that Garrett even addressed the expert's diagnosis of antisocial personality disorder. There was no question that the Commonwealth satisfied the first prong for finding Garrett to be an SVP. Garrett had committed a violent sexual crime. Without being concerned whether he had a mental abnormality or was a sexual deviant (with paraphilia or otherwise), the expert found, based at least in part on evidence unrelated to the unadjudicated charges, that Garrett had an antisocial personality disorder which increased the likelihood that he would commit further acts of a sexually violent nature, and that diagnosis was apparently approved by the Court.

> We do not challenge Dr. Gravers' assertion that mental health professionals will frequently rely upon judicial records indicating that charged conduct did not result in a final determination of guilt as nonetheless being indicative of the subject's antisocial behavior. As Code § 37.2-906(C) permits consideration of unadjudicated [sic] "charges," there undoubtedly will be instances in which additional attendant facts would permit a clinician to make a diagnosis of "Antisocial Personality Disorder" with confidence.

*Id.* at 607. In arriving at this diagnosis, Dr. Gravers testified that she considered non-sexual offenses in Garrett's juvenile and adult records, including the offenses that had been dismissed. Then, apparently making a distinction between Dr. Gravers' diagnosis of a personality disorder

(predicated on the existence of the unadjudicated allegations) and the diagnosis of a mental abnormality (predicated on the truth of the unadjudicated allegations), the Court added:

> However, with respect to a diagnosis of "Paraphilia, Not Otherwise Specified . . . Sexual Abuse of Child" in this case, the three carnal knowledge petitions standing alone were legally insufficient to permit Dr. Gravers to draw the inference that Garrett had in fact committed those offenses in the absence of any additional evidence concerning the circumstances surrounding the Commonwealth's decision to dismiss those petitions.

*Id.* Although the majority roundly rejected Dr. Gravers' acceptance of unadjudicated charges as proof of criminal conduct to support her conclusion of mental abnormality, its position with respect to the use of those charges to support her diagnosis of antisocial behavior appears to be different because there was corroborating evidence. Without considering whether or not Garrett had a mental abnormality, the Commonwealth apparently satisfied the second and third components of the second prong of the test by Dr. Graver's diagnosis "that Garrett had an 'Antisocial Personality Disorder,' which in her opinion increased the likelihood that he would commit further acts of a sexually violent nature." *Id.* at 595. The only issue on the second and third components of the second prong is whether the respondent's antisocial conduct likely would result in his committing crimes, and the statute does not limit that to crimes against children. Hence, even rejecting entirely the expert's conclusion that Garrett was a paraphile, the Commonwealth had satisfied the statutory requirements.

That proposition regarding the use of unadjudicated charges with respect to a diagnosis of antisocial behavior was expressly affirmed in *Boyce v. Commonwealth*, 279 Va. 644 (2010). "In *Garrett*, we acknowledged that mental health professionals often rely upon judicial records of charged conduct that may not have resulted in a final determination of guilt, yet nevertheless may be indicative of antisocial behavior. *Id.* at 607. We take this opportunity to reaffirm that position." *Id.* at 650.

The Court in *Garrett* clearly purported to answer the question as it characterized it at the beginning of its opinion and held that, to the extent the expert's opinion was "based, *in part*, upon," *Garrett* at 593 (emphasis added), a factor that was unsupported by any factual basis, the opinion would be inadmissible. In fact, however, without changing its apparent insistence on its express holding, the Court went further:

> [W]ith respect to a diagnosis of "Paraphilia, Not Otherwise Specified . . . Sexual Abuse of Child" in this case, the three carnal knowledge petitions standing alone were legally insufficient to

permit Dr. Gravers to draw the inference that Garrett had in fact committed those offenses in the absence of any additional evidence concerning the circumstances surrounding the Commonwealth's decision to dismiss those petitions.

*Id.* at 607. "Here, even with the additional records obtained by the Commonwealth shortly before trial, the record still supports only a finding that allegations of wrongdoing were made, but that no prosecution resulted." *Id.* at 607. One might infer, however, that, if there were evidence, perhaps within the reports, showing why the Commonwealth had not pursued the cases, that evidence might have justified Dr. Gravers' assumption that the charges were true. Without saying so, it appears that the Court was changing its observation that the expert's opinion, at least as to the diagnosis of mental abnormality, was based in part on the unadjudicated petitions, by noting instead that the only basis for the specific diagnosis was unsupported by any factual basis. (Ultimately, in *Boyce*, discussed below, the Court actually stated, or re-stated, what its holding in *Garrett* was.) At the same time, however, the Court left open the door for Dr. Gravers to testify "to the extent that she is able to revise her opinion without relying on the carnal knowledge petitions and limit her testimony to the analysis of Garrett's other juvenile and adult records, her interview with Garrett, and the standardized tests. . . ." *Id.*

Of course, Dr. Gravers had already considered "Garrett's performance on the standardized tests and his single conviction for rape" and "the nonsexual offenses in Garrett's juvenile and adult record" in reaching her diagnosis of antisocial personality disorder. *Id.* at 594-95. That diagnosis also was relevant to "the likelihood that [Garrett] would commit further acts of a sexual violent nature." *Id.* at 595. What is curious about the Court's decision is that it found that the expert's reliance on the unadjudicated petitions was fatal to the admissibility of her diagnosis of a mental abnormality (notwithstanding the fact that she had relied on other factors, as well), but invited her to "revise her opinion" based on factors which she had already considered. Hence, despite the Court's invitation, one cannot persuasively argue that the Court in *Garrett* took the position that the expert can rely on a factor for which there is no basis in fact if the expert also has other bases for the opinion. On the contrary, if the factor for which there is no basis in fact is a significant component of the expert's opinion, the opinion must be rejected entirely, because the other factors cannot serve as corroboration for the otherwise unsupported factor. At least that is so with respect to the diagnosis of mental abnormality; the Court's conclusion as to those issues with respect to the diagnosis of antisocial personality disorder is less clear, because it appears that corroborating evidence could support the diagnosis of a personality disorder even if the diagnosis is partly based on the existence of unadjudicated charges.

In *Commonwealth v. Winn*, 277 Va. 92 (2009), the issue before the Court relevant to the case at bar was whether the expert's written report was admissible, despite its containing information concerning allegations and unadjudicated charges of sexual offenses against Winn. Also at issue was whether the expert could testify as to the details of specific allegations, but that is not an issue in the case at bar. The expert, Dr. Miller, opined that Winn suffered from pedophilia, paraphilia, and antisocial personality disorder. The Court agreed with the Commonwealth that "allegations or unadjudicated charges of sexual offenses have clinical significance to licensed psychiatrists and licensed clinical psychologists who perform mental health evaluations pursuant to Code § 37.2-904(B)," *id.* at 99, and did "not question the propriety of Dr. Miller and other mental health experts considering and using such allegations in formulating their opinions as to whether a prisoner qualifies as a sexually violent predator." *Id.* Although affirming the trial court's refusal to admit the details at trial, in addressing Dr. Miller's consideration of the allegations and unadjudicated charges, the Court recited, with apparent approval, Dr. Miller's explanation that:

> "charges are considered . . . a risk factor for individuals depending on how many different times they have been charged with sex offenses, even if they were not convicted." According to Dr. Miller, psychologists look at the "quality of the offenses and what happened" as opposed to actual convictions since they may be the result of plea bargains that reduced the original charges.

*Id.* at 100. Precisely how the expert knows "what happened" is not clear, and it appears that the expert's assumption of "what happened" implies a belief that the allegation is true, despite there having been no conviction. And, despite the apparent approval of Dr. Miller's observation in that regard, the Court in *Garrett* was less impressed with a similar comment by Dr. Gravers. *See Garrett* at 595. Hence, in *Winn*, it appears that the Court authorized an expert to rely on allegations and unadjudicated charges as a risk factor. Perhaps the Court in *Winn* assumed that Dr. Miller relied only on the existence of the charges and not on the truth of the underlying allegations, but that is hardly clear from the second sentence which I have quoted. Nevertheless, assuming that to be true, that addresses the third prong of the statute, *i.e.* the risk that the respondent is likely to engage in sexually violent acts.

The Court in *Winn* referred to its holding in *Garrett* (presumably distinguishing it), stating that "three carnal knowledge petitions standing alone were legally insufficient to permit [an expert witness] to draw the inference that [the prisoner] had in fact committed those offenses in the absence of any additional evidence concerning the circumstances surrounding the Commonwealth's decision to dismiss those petitions."

The Court in *Winn* did not address whether the expert's reliance on the unadjudicated charges was for the purpose of supporting his diagnosis of a mental abnormality, a personality disorder, or both.

In *Lawrence v. Commonwealth*, 279 Va. 490 (2010), the issue was "whether expert opinion testimony dependent upon the truth of . . . unadjudicated allegations is admissible into evidence." *Id.* at 493. Lawrence had been convicted of rape and sodomy, and the expert at the SVP hearing, Dr. Gravers (again), diagnosed Lawrence with paraphilia and a personality disorder "based partially on . . . unadjudicated allegations of sexual misconduct." *Id.* at 495. For that diagnosis (although it is two diagnoses), Dr. Gravers acknowledged that "she relied on the information from the police reports in reaching the conclusion that there was a pattern of sexual aggression and intimacy deficits. Furthermore, Dr. Gravers stated that she viewed Lawrence's denials of the unadjudicated allegations as an indication of his 'minimizing' and part of his pattern of 'distorted thinking'." *Id.*

In one of two alternative arguments to support its contention that Dr. Gravers' opinion was admissible, the Commonwealth conceded that Dr. Gravers' opinion was based on the unadjudicated allegations (apparently conceding that she had accepted them as true) but argued that that was not "the sole basis for her opinions and she had other additional information she relied on in reaching her conclusions." *Id.* at 498. Responding to that argument, the Court observed:

> Dr. Gravers also stated that, while her diagnosis of paraphilia, not otherwise specified, was primarily based on Lawrence's two convictions, her conclusion that Lawrence had an antisocial personality disorder, not otherwise specified, depended on the allegations in the police reports and Lawrence's pattern of antisocial behavior, as shown through those allegations.

*Id.* at 499. The Court then held that Dr. Gravers' opinion was not admissible because it:

> did not have an adequate factual foundation to the extent it was dependent upon assuming the truth of the hearsay allegations concerning Lawrence's past sexual misconduct. Dr. Gravers' opinions, which were dependent upon the truth of hearsay allegations unsupported by evidence properly presented at trial, were speculative and unreliable as a matter of law and should not have been admitted into evidence.

*Id.* The Court actually referred to Dr. Gravers' "testimony." It is clear that it was referring to her testimony regarding her opinion, rather than her testimony regarding the details of the unadjudicated charges (which it had addressed in another part of the opinion). If Dr. Gravers' diagnosis of the

mental abnormality of paraphilia was based on Lawrence's convictions, and only her diagnosis of an antisocial personality disorder was predicated on the allegations in the police reports, the Court's decision in *Lawrence* is consistent with its observation in *Garrett* "that mental health professionals will frequently rely upon judicial records indicating that charged conduct did not result in a final determination of guilt as nonetheless being indicative of the subject's antisocial behavior," only if the Court in *Lawrence* found that Dr. Gravers did not have the "additional attendant facts would permit [her] to make a diagnosis of 'Antisocial Personality Disorder' with confidence." *Garrett* at 607. That appears to be inconsistent with its apparent approval of Dr. Miller's observation, in *Winn*, that "charges are considered . . . a risk factor for individuals depending on how many different times they have been charged with sex offenses, even if they were not convicted." *Winn* at 100.

In *Boyce*, the Court revisited the issue (and its holding in *Garrett*). In *Boyce*, the question was:

> whether the circuit court erred by refusing to strike the testimony of a mental health expert who relied upon a criminal charge for taking indecent liberties with children that was dismissed by *nolle prosequi as a factor* in forming the opinion that the appellant met the criteria for a sexually violent predator.

*Id.* at 647 (emphasis added). In *Boyce*, Dr. Miller (again) considered a charge of indecent liberties which had been dismissed on the Commonwealth's motion to *nolle prosequi*. Dr. Miller testified that it "was accepted practice in his field to consider both convictions and charges for sex offenses" and that he did rely in part on the charge which had been dismissed. *Id.* at 648. Dr. Miller did not say for what purpose he relied on the charge, nor did he say that he assumed the truth of the allegations or that he considered only their existence. Boyce moved to strike on the basis that the expert's opinion was barred by the Court's holding in *Garrett*. The trial court denied the motion, and the Virginia Supreme Court affirmed. In writing the decision for the Court, Justice Mims stated that, in *Garrett*, the narrow opinion of the Court was:

> [T]he expert's testimony was properly excluded because the *only factual basis* upon which the expert could have reached her diagnosis of "Paraphilia, Not Otherwise Specified . . . Sexual Abuse of Child" was from her reliance on the unsupported belief that Garrett committed the offenses charged, because Garrett's criminal record did not include any other charges of sexual abuse of a child, and the only adult offense of a sexual nature was a rape conviction with an adult victim.

*Id.* at 649-50 (emphasis added).

With respect to a diagnosis of a mental abnormality, the Court distinguished *Boyce* from *Garrett* by observing that, in concluding that Boyce suffered from a mental abnormality, Dr. Miller had relied, "not . . . solely" on the dismissed charge against Boyce, *id.* at 650, but on four convictions of sexual conduct involving minors and on the details that Boyce offered Dr. Miller as to some of the convictions. To be sure, the Court in *Boyce* does not state, in this portion of its opinion, that Dr. Miller assumed the truth of the allegations giving rise to the dismissed charge, but the Court apparently assumes that he did, and it is with that assumption that it distinguishes *Boyce* from *Garrett*. Hence, it appears that an expert may rely on an assumption of the truth of an unadjudicated charge if there are additional corroborating bases for the diagnosis.

The Court's holding regarding Dr. Miller's diagnosis of an antisocial personality disorder is somewhat hazier. Without having made a similar comment with respect to Dr. Miller's assumptions with respect to his diagnosis of a mental abnormality, the Court specifically observed that "Dr. Miller did not assume that Boyce was guilty of the dismissed indecent liberties charge as the basis for his opinion that Boyce suffered from a personality disorder, not otherwise specified, with antisocial traits." *Id.* Rather, his opinion for that diagnosis was based on the " 'totality of all the information' and upon his conclusion that Boyce had not benefited from multiple arrests, punishments, probation, or revocations of probation as opportunities to change his behavior." *Id.* It may be, however, that the Court was expanding its holding in *Garrett* absolutely to disallow an expert's reliance on the assumed truth of unadjudicated charges even for a diagnosis of an antisocial personality disorder, but permitting the unadjudicated charges to be considered for some other (unspecified) purpose.

## C. *Apparent Holdings of Garrett and Its Progeny*

As is clear from the definition of a sexually violent predator, the primary purpose of an expert's opinion is to satisfy the Commonwealth's obligation to show that, because a respondent suffers from "a mental abnormality or personality disorder, [he] finds it difficult to control his predatory behavior, which makes him likely to engage in sexually violent acts." Va. Code Ann. § 37.2-900. As is clear from the Code, the expert may rely on "facts, circumstances, or data . . . of a type normally relied upon by others in the particular field of expertise [which] need not be admissible in evidence." Va. Code Ann. § 8.01-401.1. As is clear from the case law, the data on which the expert relies must have some basis in fact. Less clear is the extent to which the expert may rely on unadjudicated charges, (a) assuming the truth of the allegations but with some corroborating evidence, and (b) without assuming the truth of the allegations but using them for some other purpose, as part of the basis of forming his opinion that the respondent suffers from a mental abnormality, an antisocial personality disorder, or

both. The decision in *Garrett*, refined by the decision in *Boyce*, is that the expert's opinion diagnosing a mental abnormality is inadmissible if the "only factual basis" for the diagnosis is reliance on an unsupported belief that the respondent committed unadjudicated or dismissed charges. Both *Garrett* (as refined by *Boyce*) and *Boyce* imply that, if there are other facts that support the conclusion (*e.g.*, the circumstances giving rise to the charges being dismissed, as suggested by *Garrett*, or the existence of convictions of a similar nature, as in *Boyce*), the expert may consider the probable truth of the charges in reaching a diagnosis of mental abnormality.

With respect to the diagnosis of an antisocial disorder, the Court in *Garrett* apparently approved of the expert's reliance on the truth of the charges (if supported by "attendant facts"), but, by expressly noting that Dr. Miller did not rely on the truth of the allegations in arriving at his diagnosis of a personality disorder, the Court in *Boyce* may be suggesting that, even with corroborating evidence, the expert may not assume the truth of the allegations, but may consider the existence of a charge as a factor in the conclusion.

The decision in *Lawrence* is that the trial court may not admit an expert's opinion as to either a mental abnormality or personality disorder which is dependent on the truth of allegations not supported by evidence presented at trial. *See Ellison v. Commonwealth*, 273 Va. 254 (2007).

Entirely apart from the diagnoses of the respondent's mental condition (mental abnormality or personality disorder), the decision in *Winn* is that unadjudicated charges have clinical significance for experts and that the expert may rely on the existence of those charges, regardless of their truth, for the purpose of assessing the risk that the respondent will likely engage in sexually violent acts.

## D. *Application of the Law to This Case*

Perhaps one can see why I am having some difficulty harmonizing the opinions. It is that body of law which the Court must attempt to apply to determine the admissibility of Dr. Nelson's opinion.

Considered in the most charitable light; the evidence which Dr. Nelson offered in the Evaluation and the testimony he offered at the Hearing disclosed either (or in some combination) that he was ill-prepared for trial, did not recognize the inconsistencies in his own writing and testimony (inconsistencies with each other and inconsistencies between each mode of expressing his opinion), did not recognize even the strengths of his observations (being persuaded, by skillful examination, to diminish their impact), and, generally, did not cover himself in glory in expressing an opinion.

I note that, as the fact finder, my evaluations of credibility are not limited to choosing between competing accounts offered by different witnesses, *see, e.g., Hamilton v. Commonwealth*, 279 Va. 94, 105, but often include, as in this case, resolving conflicts in a single witness' testimony, accepting that part of the testimony it deems credible and rejecting the portion it deems

incredible. *See Hopkins v. Commonwealth*, 230 Va. 280, 293 (1985); *see also Commonwealth v. McNeal*, 282 Va. 16, 22 (2011).

That does not make his opinion inadmissible, which is the issue before the Court at this stage of the proceeding. It does diminish the weight of the opinion as a basis for the ultimate finding of fact in the case. On that issue, I note that, in charging the trial court with certain responsibilities at the probable cause hearing and partly detailing the parameters of an expert's opinion, the General Assembly has specifically provided that the experts' "opinions shall not be dispositive of whether the respondent is a sexually violent predator." Va. Code Ann. § 37.2-906(E). The explicit message is that, although an expert's opinion may be admissible, it may be, for reasons unrelated to its evidentiary acceptability, unpersuasive.

### 1. *Adequate Factual Foundation without Inferring the Truth of Allegations*

Dr. Nelson relied on the two convictions for aggravated sexual battery under Va. Code Ann. § 18.2-67.3(1) for events occurring in November 2010. Both of these convictions satisfy the first prong as required by Va. Code Ann. § 37.2-900.

In addition, these two convictions provide a starting point for determining if Reed satisfies the first component of the second prong of the statutory definition of a sexually violent predator (SVP) (specifically with respect to the mental abnormality of pedophilia). Dr. Nelson described pedophilia as "an enduring sexual interest in prepubescent children [by] people who are sexually attracted, either in fantasies or behavior, in a way that is disruptive to their life for a period of, typically, six or more months, to children who are prepubescent." Tr. at 49. Although the two convictions provide a starting point to indicate sexual interest in prepubescent children, standing alone, they cannot demonstrate an enduring sexual interest. However, Reed admitted to Dr. Nelson (the Court at this point need not consider that Reed allegedly made the same admissions to the police) that, on August 24, 2008, he "talked [a mentally retarded man] into showing his penis to . . . Reed, while that man's ten-year-old little brother was present." Evaluation at 2. Dr. Nelson stated that "because an underage prepubescent boy is involved at a time when [Reed] is seeking out sexual behavior, that does point towards pedophilic interests." Tr. at 56. The opinion was further supported by the fact that Reed "had asked both the child and young adult to come with him to the other side of the pond, so he asked to have the youngster included." *Id.* at 72. Dr. Nelson had an adequate factual foundation, *i.e.* Reed's admission to Dr. Nelson, to believe that this event occurred, and these events taken together support an opinion that Reed suffers from the mental abnormality of pedophilia because he has an enduring sexual interest in prepubescent children. Therefore, the first component of the second prong is satisfied.

With respect to the second and third components of the second prong, Dr. Nelson determined that Reed "finds it difficult to control his predatory behavior such that he is likely to engage in sexually violent acts." Evaluation at 18. Dr. Nelson made this determination by relying on risk factors which, according to *Winn*, do not require the inference of truth for unadjudicated charges. Multiple actuarial tests indicated that Reed is at or above the 90th percentile of reoffending. Evaluation at 17. Additional risk factors were: (1) Reed's complete lack of a social support network; (2) his schizotypal personality disorder (which was diagnosed based on Dr. Nelson's interview of Reed, from which he concluded that Reed "had a long-standing pattern of eccentric interests and thought patterns with little capability for emotionally close relationships [and h]is odd ideas about magic" (Evaluation at 15); and (3) his limited capacity for self-regulation (which Dr. Nelson diagnosed based on Reed's admission of exposing himself while on supervised probation only a few months after being incarcerated for two years for aggravated sexual battery [Evaluation at 17]). This last risk factor is similar to that in *Boyce* where the Court observed with apparent approval Dr. Miller's opinion that "the essence of a personality disorder is that a person does not benefit from being caught, punished, and offered opportunities at rehabilitation." *Boyce* at 650. That analysis clearly applies here where Reed was caught, was incarcerated for two years, was then offered supervised probation to rehabilitate himself, and in a few months engaged in an act of exhibitionism (even though he asserted that the woman to whom he exposed himself requested it). Therefore, the second and third components of the second prong are satisfied.

*2. Corroborating Evidence Permitting the Inference of Truth of the Allegations*

Although at no point did Dr. Nelson directly state that he inferred or assumed the truth of the unadjudicated charges, I find that there is corroborating evidence sufficient to permit Dr. Nelson to have inferred the truth of the unadjudicated charges with respect to reaching a diagnosis on the mental abnormality of pedophilia on the basis of the holding in *Garrett* as refined by *Boyce*. The corroborating evidence are Reed's admissions, of which there are two types: (1) admissions made to police and a probation officer, and (2) admissions made to a therapist for treatment.

In *Garrett* and in *Lawrence*, Dr. Gravers made an impermissible inference that the unadjudicated charges or unsubstantiated allegations (or both) were true. Here, Dr. Nelson developed his factual foundation based on admissions by Reed contained in police reports, based on *admissions* by Reed contained in probation reports, based on admissions by Reed contained in sex offender treatment reports, and based on admissions made by Reed to Dr. Nelson. *See* Tr. at 55:11-25; 56:1-7; 57:14-23; 59:18-25; 62:7-18. While admissions contained in police reports are out of court

statements offered for the truth of the matter asserted, they are of a different flavor from ordinary hearsay, and admissions are the first recognized exception to hearsay. However, I recognize that Reed denies or has recanted those alleged admissions, so I am cognizant of potential danger in blindly accepting those alleged admissions contained in the police reports. While no misconduct or coercion has been alleged in eliciting these admissions, the Court is mindful of the possibility of such a situation arising in the adversarial and accusatory environment of an interrogation. This problem could have been avoided by having the police and probation officer testify in court under oath that Reed made these admissions.

Even if one is not persuaded by the distinction between admissions by Reed contained in police reports and allegations by others contained in police reports, I find that there is a qualitative difference between admissions made to a police or probation officer in an adversarial and accusatorial setting from admissions made to a therapist in a setting in which Reed's well-being and rehabilitation are the goals. General public policy encourages people to be truthful to persons providing treatment, so that the patient can receive the appropriate medical or mental health care. The General Assembly, implementing this public policy, has statutorily protected communications regarding treatment by making them privileged so that there would be no obstacle keeping a patient from telling the truth. *See* Va. Code Ann. § 8.01-399 and § 8.01-400.2. The Supreme Court of Virginia also recognizes the importance of removing obstacles from a patient's telling the truth in obtaining treatment by approving evidentiary rules making those communications privileged. *See* Rules of Supreme Court of Virginia 2:505 and 2:506. Further, the Supreme Court of Virginia believes the underlying policy rationale is of such significance that it is a valid basis for being an exception to the hearsay rule. *See* Rule 2:803(4). As a result, Reeds admissions to Vicky Cash-Graff during treatment (that he engaged in exhibitionism with prepubescent children) provides additional corroborating evidence from which Dr. Nelson could have inferred the truth of the allegations with respect to diagnosing Reed with the mental abnormality of pedophilia. *See* Tr. at 57.

### III. *Conclusion*

Even without his relying on the truth of the allegations of unadjudicated charges, I find that Dr. Nelson had an adequate factual foundation to make the determination that Reed suffers from the mental abnormality of pedophilia. I also find that the admissions made by Reed, at least to the therapist during the course of evaluation or treatment, provide additional corroborating evidence such that Dr. Nelson could properly infer the truth of the unadjudicated charges as discussed in *Boyce*.

I could, but need not, address whether those admissions are the sort of "attendant facts" described in *Garrett* which might support a reliance on the truth of Reed's admissions contained in the police reports.

Further, I find Dr. Nelson's determination of the second and third component of the second prong with respect to the risk that Reed would find it difficult to control his predatory behavior which makes him likely to engage in sexually violent acts is proper, as discussed in *Winn*. Accordingly, I conclude that Dr. Nelson's expert opinion is admissible, with the caveat as to its weight that I have already discussed.

Based on the stipulation of the parties that the admission of Dr. Nelson's opinion satisfies probable cause, this case will proceed to trial.